Syllabus.

# Richmond.

## M. J. BOGGS v. W. T. SNODDY, SHERIFF.

February 25, 1926.

Absent, Christian, J.

1. APPEAL AND ERROR—*Assignments of Error—Evidence not Sufficient to Support the Verdict—Consideration of Other Assignments Unnecessary.*—The instant case was an attachment proceeding by an administrator c. t. a. against a nephew of decedent, in which it was charged that the nephew had fraudulently converted to his own use property of the decedent. A number of errors were assigned to the judgment of the lower court, and finally, that the verdict confirmed by the court was without evidence to support it.

   *Held:* That as this last assignment was well taken, the other assignments were of academic interest only, and need not be discussed by the appellate court.

2. CONTRACTS—*Contract for Support and Maintenance—Validity.*—The instant case was an attachment proceeding by an administrator c. t. a. against a nephew of decedent, in which it was charged that the nephew had fraudulently converted to his own use property of the decedent. The nephew asserted and proved a contract with the decedent under which the decedent turned over certain bonds to the nephew. The decedent was to have the interest on the bonds and the nephew was to take care of the decedent the balance of his life and at his death spend at least $500.00 for his burial expenses. This agreement was oral.

   *Held:* That the agreement was valid.

3. ILLEGAL CONTRACTS—*Rescission of Contract—Parties in Pari Delicto—Case at Bar.*—In the instant case, an attachment proceeding by an administrator against the nephew of his decedent, plaintiff sought to set aside a transfer of bonds from the decedent to his nephew, alleging that the transfer was made in order to defeat any claim which decedent wife, with whom he was having difficulty, might have against him.

   *Held:* That as the parties stood *in pari delicto*, the court must leave them where it found them.

4. DECLARATIONS AND ADMISSIONS—*Self-Serving Declarations and Admissions—Parties to a Transfer Declaring that the Transfer was Fic-*

*titious.*—Declarations by one who had transferred bonds to another, to the effect that the transfer was not *bona fide* but was made with intent to keep his wife's lawyer from getting the bonds for her, are plainly self-serving and inadmissible in a proceeding to set aside the transfer.

5. WITNESSES—*Transactions with Deceased Persons—Section 6209 of the Code of 1919—Refusal of Party to Testify—Case at Bar.*—In the instant case, an attachment proceeding by an administrator against a nephew of his decedent to recover property of the decedent alleged to have been fraudulently converted by the nephew, certain declarations of the testator to the effect that bonds transferred by him to the nephew were transferred merely for the purpose of hiding them from the attorney of his wife, with whom he was having difficulty, were not admissible under section 6209 of the Code of 1919, where the nephew did not testify. The nephew had the plain right not to testify, and no inferences could be drawn from his refusal.

6. EXECUTORS AND ADMINISTRATORS—*Administrator's Rights the Same as His Decedent's—Fraudulent Transaction.*—A court will not set aside a transaction confessedly fraudulent at the instance of the party upon whose suggestion the fraudulent device was adopted, and the administrator of such party has just such rights as the decedent and no others.

7. CONTRACTS—*Rescission of Contracts—Illegal Contracts—Parties in Pari Delicto—Case at Bar.*—The instant case was an attachment proceeding by an administrator c. t. a. against a nephew of decedent, in which it was charged that the nephew had fraudulently converted to his own use bonds of the decedent. All the evidence was to the effect that the bonds in question were turned over by the decedent to his nephew and its clear weight was that this was done on the conditions claimed by the defendant, namely, in return for a promise by the nephew to take care of his uncle during life, allow him to draw interest on the bonds and to pay $500.00 burial expenses for him at his death. If this was not true then it appeared that the transfer was with intent to defraud the claims of decedent's wife, with whom at the time he was having trouble.

*Held:* That in either event the plaintiff could not recover.

8. TROVER AND CONVERSION—*Evidence to Show Conversion—Case at Bar.*— The instant case was an attachment proceeding by an administrator c. t. a. against a nephew of decedent, in which it was charged that the nephew had fraudulently converted to his own use money belonging to the decedent. There was nothing to show that the nephew had appropriated money belonging to the decedent.

*Held:* That plaintiff made out no case and even on a demurrer to the evidence must fail. There being simply nothing on which to base a verdict, the attachment must be dismissed.

Error to a judgment of the Circuit Court of Buckingham county, in attachment proceedings. Judgment for plaintiff. Defendant assigns error.

*Reversed.*

The opinion states the case.

*Claude R. Wood, John D. Easley* and *A. L. Pitts, Jr.,* for the plaintiff in error.

*A. B. Dickinson* and *Hubard & Boatwright,* for the defendant in error.

HOLT, J., delivered the opinion of the court.

This is an attachment proceeding instituted by W. T. Snoddy, sheriff of Buckingham county and as such administrator c. t. a. of the estate of Frank W. Bower, deceased. The petition was filed on October 10, 1922, in which it is charged that M. J. Boggs had fraudulently converted to his own use property of said decedent amounting to $14,970.00. The terms plaintiff and defendant will be used here as they were in the court below.

The record is large and confusing, but out of its mist the following facts emerge with reasonable distinctness:

Bower was a citizen of West Virginia; had lived in that State all his life and was there three times married. In a short time after his last marriage he had trouble with his wife, left her, and came to Buckingham county, Virginia, to live with his nephew, M. J. Boggs, the defendant. This was in the summer of 1920. He remained there until May, 1922. In the spring of that year his wife came to see him. There was a reconciliation and he returned with her to West Virginia.

He was sick when he left Virginia, was taken to her home in West Virginia and soon afterwards to a hospital, where he died following a brief illness.

During this time Boggs had occasion to go to West Virginia as a witness in some disconnected matter and while there went to the Bower home. On that occasion he told the wife about the will. This information he confirmed by the following letter written upon his return home:

"WILLOW HILL FARM,
"M. J. BOGGS,
"SCOTTSVILLE, VIRGINIA, *June 19, 1922.*
"MRS. FANNIE BOWER,
"*Sutton, West Virginia.*
"DEAR MADAM:

"I am writing you in regard to F. W. Bower estate. He left a will which disposed of his property, which will was written by W. L. Armstrong, of Sutton, West Virginia, and executed July 12, 1921; Mr. Armstrong can give you the terms of the will. He gave me his Liberty Bonds to take care of for him for his natural lifetime, under an agreement out of which I was to spend $500.00 for his burial expenses, but he was to have the interest on the bonds as long as he lived, which he got. When he left my home he had two pocketbooks, one of which he got from my wife. He gave me one of these on the train which contained $120.00 in cash and no papers of any value. I don't know what became of the other one.

"I was made executor of his will, which will have to be probated in Buckingham county, Virginia.

"Any communication you may have in regard to the estate will be appreciated by me.

"Very truly yours,
"M. J. BOGGS."

On September the 27th he brought this will to the clerk's office of Buckingham county, but refused to accept the position of executor and the estate was committed to the sheriff, who promptly, upon qualification, sued out the attachment now before us. On October 11, 1922, it was levied upon sundry articles of personal property and on November 6, 1922, on certain real estate. On December 14, 1922, the defendant appeared specially by counsel, moved to quash and demurred. The court at that time, over his objection allowed the plaintiff to amend his petition and the sheriff to amend his return. The demurrer was overruled and so was a motion for continuance.

Here conventions were clean forgot. Mrs. Bower made affidavit charging Boggs with larceny. The judge issued a bench warrant; a special grand jury was summoned to inquire into this and promptly returned the indictment prepared for their consideration endorsed: "Not a true bill." Thereupon the trial resumed its troubled way.

The judge, over Boggs' protest and without the aid of a jury, proceeded to hear evidence on the motion to quash. All of it in the record to page 196 bears on this motion and was not heard by the jury. Since the jury did not hear it, it cannot be relied upon to support the verdict and on that issue must be disregarded. The defendant then, and on December the 15th, answered. A special jury was summoned and sworn to try the case upon its merits. The following verdict was returned on the 18th:

"This day came the parties, both plaintiff and defendant, by their attorneys, and then came the jury pursuant to their adjournment and the jury having fully heard the evidence and argument by counsel, retired to their room to consider of their

verdict, and after some time returned into court with a verdict in these words, to-wit: We, the jury, find for the plaintiff on the issue joined and assess his damages at $7,790.00, with interest from June 1, 1922, until paid.

"A. C. GARNETT, JR., Foreman."

[1.] A number of errors are assigned. It is said that a jury should have been called to try the issues of fact on the motion to quash; that illegal evidence was admitted and that improper instructions were given; and finally, that the verdict confirmed by the court was without evidence to support it.

If this last assignment be well taken, and we think it is, then all other assignments are of academic interest only. We cannot undertake to discuss them.

Bower brought with him to Virginia fifty-two or fifty-three hundred dollars in government bonds—Liberty Bonds—and forty-three hundred dollars in cash. These bonds he left for safekeeping in the Scottsville National Bank and at the same time deposited there forty-three hundred dollars in money, taking as evidence of this certificates of deposit.

For convenience these bonds and this money will be considered each in its turn.

[2] Boggs' interest in these bonds grew out of a contract with Bower. J. M. Boggs, a son of the defendant, has testified as to the terms of this contract:

"Q. Did you ever hear Mr. Bower at any other time say anything about this bond transaction?

"A. Yes; I heard him say afterwards he had turned his bonds over to father; he was to take care of him the balance of his life and he was to have the interest off those bonds, and, at his death, my father should spend at least five hundred dollars in his burial ex-

penses, and also to be taken to West Virginia if he
died in this county and be buried by his second wife.
He also said he wanted a steel casket, to be buried the
same way he put his second wife away, and said it
cost him about five hundred dollars to do that.''

There was nothing wrong about this. *Terry* v.
*Clark*, 84 Va. 221, 4 S. E. 372; *Thomas* v. *Armstrong*,
86 Va. 323, 10 S. E. 6, 5 L. R. A. 529; 27 C. J. 184.

W. S. Dorrier, cashier of the Scottsville bank, was
introduced as a witness on behalf of the plaintiff. His
evidence is that Bower left these bonds with him on
August 7, 1920. Afterwards they were withdrawn by
Bower and later brought back to the bank, not by
Bower, but by Boggs. This was in October, 1921.
The conditions under which they were returned are
stated by him to be as follows:

"Q. What was it? Did you ever hear Mr. Bower
say, either in Mr. Boggs' presence or any one else's,
that he had turned over these bonds to Mr. Boggs in
consideration that Mr. Boggs would take care of him
during his life, or anything to that effect?

"A. I don't recall hearing Mr. Bower make that
statement.

"Q. Did you hear Mr. Boggs make any such state-
ment?

"A. I think Mr. Boggs made it in Mr. Bower's
presence that there was an agreement between them
to that effect.

"Q. Did Mr. Bower hear that statement?

"A. I am quite sure he did.

"Q. Did he question it in any way?

"A. He did not."

He also stated that at Boggs' direction he clipped
interest coupons and gave them to Bower.

Richard J. Nicholas, the assistant cashier of this

bank, also testified as a witness for the plaintiff. His evidence in part is: "Mr. Bower was present when Mr. Dorrier told me that the bonds had been left there in Mr. Boggs' name. Mr. Bower had turned them over to Mr. Boggs for his keeping him." And again:

"Q. What occurred at that time?

"A. Mr. Bower came to collect the interest on the bonds left there. I looked for the bonds and while looking for the bonds he told me he was looking for *Mike Boggs' bonds.* I asked him if it would be all right with Mike Boggs to pay interest on the bonds left in his name and he said it would be all right with Mr. Boggs. I said if that is all right with Mike Boggs he should make that statement to me or he should tell us to pay you the interest.

"Q. Then what occurred?

"A. He said: Well, there is nothing to do about it, he didn't want any misunderstanding and he would bring Mike Boggs or a note instructing me to pay the interest to Mr. Bower.

"Q. Did he do that?

"A. He brought Mr. Boggs a day or two afterwards. I clipped the coupons off and paid to Boggs.

"Q. What did Boggs do with the money?

"A. I think he turned it over to Mr. Bower, but I could not swear to it."

S. R. Gault states that Mr. Bower said to him that he had fifty-two hundred dollars worth of bonds that he wanted to turn over to Mr. Boggs and that "he wanted me to fix the papers." This witness then proceeded to question Mr. Bower as to the character of these securities and when he ascertained that they were coupon and not registered bonds advised him that they passed by delivery and that no writing was necessary.

T. F. Turner, another witness for the defendant, said that Bower on one occasion told him: "I have a bunch of bonds myself, and he says, I have turned them over to Mike." He says, the interest on those bonds will be what spending money I need, and about that time Mr. Boggs called us and we all went on down there, and that was all that was said and all I know about it."

W. N. Salmon was asked:

"Q. Did you ever hear him say or have any conversation with him about any bond transaction with M. J. Boggs?

"A. He told me he had some bonds and turned them over to Mr. Boggs to take care of him as long as he lived."

As we have seen, the defendant's son testified to the same effect.

[3-5] This evidence was so overwhelming that the plaintiff sought to break its effect in rebuttal by showing that they were placed with Boggs by Bower to defeat any claim which his wife might have against him.

Bert Isenhart's testimony on this point is:

"Q. You say Mr. Bower told you he had those bonds in the Scottsville National Bank?

"A. Yes, sir.

"Q. $5,200.00?

"A. Yes, sir.

"Q. Did he say in whose name they were put in that bank?

"A. Yes, sir.

"Q. In whose name?

"A. Mike Boggs' name.

"Q. M. J. Boggs, here?

"A. Yes, sir.

"Q. And he told you he put them in there to keep his wife from getting them?

"A. No, sir.

"Q. But from the lawyers getting them?

"A. Had his money hid to keep the lawyers from getting hold of it.

"Q. Did he say anything about any claims his wife had against him?

"A. No, sir; said she had a warrant out for him.

"Q. Said he had trouble with his wife?

"A. Yes, sir.

"Q. Did he say his lawyers were trying to get him on account of his trouble with his wife?

"A. He was afraid they would get hold of his money.

"Q. For his wife?

"A. I don't know about that.

"Q. Who was he afraid the lawyers would get hold of it for?

"A. He told me his wife had a warrant out for him and he didn't want the lawyers to get hold of his money."

Mrs. Cora Isenhart's evidence is to the same effect. Her statement is:

"Q. And he put them in the bank in M. J. Boggs' name?

"A. Yes, sir.

"Q. To keep Mrs. Bower's lawyer from getting the bonds for her?

"A. Yes, sir.

"Q. So he turned them over in Mr. Boggs' name to keep them from being subjected to the claim that Mrs. Bower was asserting against him?

"A. Yes, sir."

If we were to believe this it could not affect the result. The parties stood *in pari delicto*. One cannot

assign his estate to a friend to defeat a creditor and then come into court and say: "The threatened danger is past. The steps taken to defraud my creditors once necessary are no longer so and I now petition the court to direct that my associate in the fraud we intended be ordered to return my money to me." Of course any court would leave these parties where it found them. Moreover, these declarations are plainly self-serving. Boggs did not testify and so from any angle they are inadmissible. Section 6209 of the Code. He had the plain right not to testify. To have done so would have been to let down the floodgates and no inferences are to be drawn from his refusal.

Mrs. Bower stated in rebuttal that on the occasion of her visit to her husband in 1922, the matter of the purchase of a home in Virginia was considered and that some negotiations were had with Boggs about this matter. Nothing came of it. The value of the contemplated purchase is not stated nor its extent. This husband and wife were then reconciled, and all was long after the transfer of the bonds. There is nothing in this to show the conditions in such transfer. That there was a complete transfer is both proven and admitted.

R. M. Reynolds, the father of Raymond B. Reynolds, one of the legatees in the Bower will, testifies to having heard Boggs say: "Uncle Frank gave me $500.00 to pay burial expenses and it will take all of it and more too."

This statement is not in conflict with the evidence produced both by plaintiff and defendant showing that these bonds had been turned over to Boggs. It might by implication be held to conflict with testimony dealing with the conditions under which Boggs took them. We have seen that the defendant's claim is

that he was to support Bower during his life, pay his burial expenses, not to exceed $500.00, and permit him to collect interest as it accrued.

[6] Some evidence for plaintiff is in substance that this transfer was made to defeat any claim that Mrs. Bower might establish in her threatened suit. It follows that the Reynolds testimony, if in conflict with defendant's evidence at all, is in entire harmony with it as to the transfer itself. This court is asked to set aside a transaction confessedly fraudulent and by the party at whose suggestion the fraudulent device was adopted. The administrator had just such rights as the decedent had. *Spooner* v. *Hilbish*, 92 Va. 333; 27 C. J. 647.

[7] Our conclusions as to this phase of this case are: All the evidence is to the effect that Bower turned over these bonds to Boggs and its clear weight is that this was done on the conditions claimed by this defendant. If this be not true, then the transfer was with intent to defraud. In either event the plaintiff cannot recover.

[8] There is nothing to show that Boggs appropriated to his own use money belonging to decedent. From Dorrier's testimony it appears that Bower deposited on August 7, 1920, in the Scottsville bank, $4,300.00 and took therefor certificates of deposit. On December 23, 1920, he brought them back. They were cancelled and in lieu thereof he took three $1,000.00 certificates and the balance in cash. Boggs then borrowed from Bower $3,000.00 and gave his note for that sum, taking the certificates of deposit. Bower appears to have loaned French Boggs $1,000.00.

Bower was intelligent, but illiterate. He could not write and for that reason asked J. M. Boggs to set down on a memorandum certain credits on the $3,000.00

note. That memorandum is in evidence. Young Boggs' testimony relative thereto is:

"Q. Read it to the jury.

"A. To cash $30.00.

"Q. Read the names and all.

"A. F. W. Bower's account; to cash $30.00; to expenses to Richmond $8.50.

"Q. Any dates?

"A. Yes, sir.

"Q. Read everything?

"A. The first was April 2, 1921.

"Q. Of what item is that the date?

"A. To cash. Also on the same date to his expense to Richmond $8.50. On the same date one pair of shoes $8.00. June 10th to one suit of clothes.

"Q. What year?

"A. 1921. One suit of clothes. That is C. B. Harris, Jr., and Company, $35.00; July 6, 1921, by interest on $3,000.00 note for six months $90.00. On July 6th, same date and same year, to cash credit on $3,000.00 note this date, $1,800.00. August 18, 1921, to one hat, $2.50; one shirt, $1.75; and on October 28th to one pair of gum shoes, $3.50. Those shoes were bought from W. F. Boggs; on November 3rd to cash, W. F. Boggs to pay Mrs. Coleman, $10.00; February 17, 1922, check to Mrs. Romie Reynolds, $12.00; on March 10, 1922, check to Mrs. F. W. Bower, $10.00; on March 22nd, check to Mrs. F. W. Bower, $21.00; March 22, 1922, by eight and one-half months interest on $1,147.75, $48.78."

This witness also stated that Bower had this note with him when he left for West Virginia and in addition a considerable sum of money. His evidence is:

"He asked her (witness' mother) did she have a pocket book she would sell him and she told him 'no,'

but said she had one Clarence gave me as a present and I will loan it to you and he says 'no, I want to buy it,' and he says 'well, may be I will return it some time.' So he went over to the bed. I was sitting by the fireplace and she was sitting by the sewing machine, and he took out a roll of money out of his left front pocket. I don't know how much money was in the bunch, but a considerable large amount of money, and I also happened to notice he had the bills rolled up like this (indicating) and the note was on the inside of the roll of money and he put this inside of the pocket book and put it in his left hip pocket. And he took out another paper bag and counted his money in it and laid it out bill at time and counted it. I didn't ask him any questions, and he got up and says: 'Well, I have just $135.00 to spend on this trip', and walked up to the fireplace and gave me a flip on the chin." The amount of cash this witness did not undertake to state, but he does say that he saw several $50.00 bills.

This evidence is not intrinsically improbable. It has not been contradicted and it cannot be ignored. It is, in substance, that Bower took back with him to West Virginia the Boggs' note and considerable cash. And it is entirely certain that Bower at that time had made no complaint of his treatment at the hand of Boggs. And it is pertinent to remember that he left without protest the bonds which he had turned over to Boggs with Boggs. From the time of his return to West Virginia the record is silent as to his estate. Mrs. Bower did find $150.00 in one pocket book. Somebody got the balance of this money, but the burden is not on Boggs to point out the guilty party.

It is true that Boggs declined to qualify as executor and that he stated that the estate was small when he

must have known that Bower held his note on which there was a balance due of $1,000.00 or $1,200.00. On the other hand, if he entertained any such purpose as is charged in the attachment, the probabilities are that he would have administered on the estate himself rather than let it pass into the hands of a stranger. But this is all beside the mark. The plaintiff has made out no case and even on a demurrer to the evidence must fail. There is simply nothing on which to base a verdict.

The attachment must be dismissed and the judgment of the court below reversed and this action dismissed. Nothing that is here said shall prejudice the plaintiff in any attempt he may make to recover from the defendant whatever may be in fact due on the $3,000.00 note.

*Reversed.*